Opinion for the court filed by Chief Judge PROST. Concurring opinion filed by Circuit Judge O’MALLEY. Dissenting opinion filed by Circuit Judge NEWMAN.
PROST, Chief Judge.
The Tariff Act of 1930 provides the International Trade Commission (“Commission”) with authority to remedy only those unfair acts that involve the importation of “articles” as described in 19 U.S.C. § 1337(a). Here, the Commission concluded that “articles” “should be construed to include electronic transmission of digital data....” In re Certain Digital Models, Inv. No. 337-TA-833 at 55 (Apr. 3, 2014) (“Final Comm’n Op.”). We disagree.
The Commission’s decision to expand the scope of its jurisdiction to include electronic transmissions of digital data runs counter to the “unambiguously expressed intent of Congress.” Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under step one of Chevron, “[w]e begin with the text of [the statute].” King v. Burwell, — U.S. -, 135 S.Ct. 2480, 2489, 192 L.Ed.2d 483 (2015). Here, it is clear that “articles” means “material things,” whether when looking to the literal text or when read in context “with a view to [the term’s] place in the overall statutory scheme.” Id. We recognize, of course, that electronic transmissions have some physical properties— for example an electron’s invariant mass is a known quantity — but commonsense dictates that there is a fundamental difference between electronic transmissions and “material things.” Our analysis is therefore complete. However, even under step two of Chevron, an analysis of the Commission’s opinion makes clear that it is unreasonable and therefore not entitled to deference.[1]
*1287 Accordingly, we reverse and remand the Commission’s decision and conclude that the Commission does not have jurisdiction over this case.[2]
I.Background
The Commission instituted the present investigation based on a complaint filed by Align Technology, Inc. (“Align”). Align alleged a violation of 19 U.S.C. § 1337 (“Section 337”) by reason of infringement 'of various claims of seven different patents.[3] The respondents to the investigation were ClearCorrect Operating, LLC (“ClearCorrect US”), and Clear Correct Pakistan (Private), Ltd. (“ClearCorrect Pakistan”) (collectively “ClearCorrect”).
The technology at issue in this case relates to the production of orthodontic appliances, also known as aligners. The aligners in question “are configured to be placed successively on the patient’s teeth and to incrementally reposition the teeth from an initial tooth arrangement, through a plurality of intermediate tooth arrangements, and to a final tooth arrangement.” '880 patent (abstract). ClearCorrect is a producer of these aligners.
ClearCorrect makes its aligners through the following process. ClearCorrect U.S. scans physical models of the patient’s teeth and creates a digital recreation of the patient’s initial tooth arrangement. This digital recreation is electronically transmitted to ClearCorrect Pakistan, where the position of each tooth is manipulated to create a final tooth position. ClearCorrect Pakistan then creates digital data models of intermediate tooth positions. One intermediate tooth position is created for each incremental aligner. ClearCorrect Pakistan then transmits these digital models electronically to ClearCorrect US. Clear-Correct U.S. subsequently 3D prints these digital models into physical models. Then an aligner is manufactured by thermoplastic molding using the physical model. Here, the accused “articles” are the transmission of the “digital models, digital data and treatment plans, expressed as digital data sets, which are virtual three-dimensional models of the desired positions of the patients’ teeth at various stages of orthodontic treatment” (“digital models”), from Pakistan to the United.States. Final Comm’n Op. at 17.
The parties and the Commission agreed to divide the patent claims into four Groups: Group I contains those claims that relate to methods of forming dental appliances,[4] Group II contains those claims that relate to methods of producing digital data sets,[5] Group III contains those claims that relate to a treatment plan based on a series of digital data sets on a storage medium,[6] and Group IV contains those claims that relate to methods of producing dental appliances.[7] The Commission found *1288 the Groups I and II claims[8] to be infringed and not invalid. It is these claims that are at issue in this appeal. The Commission found the Groups III and IV claims to be either beyond the scope of the Commission’s jurisdiction or not infringed. The Commission’s ruling concerning Groups III and IV are at issue in companion case Align Technology, Inc. v. International Trade Commission, No. 2014-1533, and not at issue in this case.
While the Group 1[9] and Group II[10] claims differ, for purposes of this appeal it is the similarity in Align’s allegations of ClearCorrect’s infringement that are relevant — namely, ClearCorrect Pakistan’s electronic transmission of digital models to ClearCorrect US.
The Administrative Law Judge (“ALJ”) conducted an evidentiary hearing in February 2013, and on May 6, 2013, issued its Initial Determination. The ALJ found that — but for the claims related to the '666 patent — ClearCorrect infringed the Groups I and II patent claims. In so finding, the ALJ determined that the' Commission had authority to order ClearCor-rect to stop electronically importing digital models into the United States. The ALJ recommended that the Commission issue a cease and desist order directed to Clear-Correct to prohibit the importation of digital models.
In response, both ClearCorrect and Align filed petitions for Commission review. The Commission initiated a review of the entire Initial Determination and solicited briefing from the parties and the public. While the public did not respond to the initial request by the Commission, the Commission extended its deadline and issued another notice to the public. In response to this notice, the Commission received briefing from various nonparties including: the Association of American Publishers, Google Inc., Andrew Katz, The Motion Picture Association of America, and Nokia Corp.
On April 3, 2014, the Commission terminated the investigation finding the Groups I and II patent claims infringed. Specifically, the Commission found that Clear-Correct U.S. directly infringed the Group I *1289 patents and ClearCorrect Pakistan contributed to that infringement.[11] The Commission determined that, because Clear-Correct US’s infringement occurred in the United States, it was not a violation of Section 337. The Commission instead exerted its authority over ClearCorrect Pakistan as a contributory infringer for importing .the data models. Additionally, the Commission found that ClearCorrect Pakistan practiced the Group II method claims in Pakistan and found that the importation of the resulting digital models violated 19 U.S.C. § 1337(a)(l)(B)(ii). Finally, the Commission agreed with the ALJ that the Commission had jurisdictional authority over electronically imported data under Section 337. The Commission has stayed its cease and desist order until this appeal is resolved.
Following the Commission’s decision, this case was timely appealed to us. We have jurisdiction to review the Commission’s findings under 28 U.S.C. § 1295(a)(6).
II. Discussion
“Section 337 declares certain activities related to importation to be unlawful trade acts and directs the Commission generally to grant prospective relief if it has found an unlawful trade act to have occurred.” Suprema, Inc., 796 F.3d at 1345. “As a trade statute, the purpose of Section 337 is to regulate international commerce. Section 337 necessarily focuses on commercial activity related to cross-border movement of goods.” Id. (citation omitted). Congress established Section 337 to “eurb[ ] unfair trade practices that involve the entry of goods into the U.S. market via importation. In sum, Section 337 is an enforcement statute enacted by Congress to stop at the border the entry of goods, i.e., articles, that are involved in unfair trade practices.” Id. Section 337(a)(1) reads as follows:
Subject to paragraph (2), the following are unlawful, and when found by the Commission to exist shall be dealt with, in addition to any other provision of law, as provided in this section:
(A) Unfair methods of competition and unfair acts in the importation of articles (other than articles provided for in sub-paragraphs (B), (C), (D), and (E)) into the United States, or in the sale of such articles by the owner, importer, or consignee, the threat or effect of which is—
(B) The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that—
(C) The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that infringe a valid and enforceable United States trademark registered under the Trademark Act of 1946 [15 U.S.C. 1051 et seq.].
(E) The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consigner, of an article that constitutes infringement of the exclusive rights in a design protected under chapter 13 of title 17.
19 U.S.C. § 1337 (alteration in original) (emphases added).
The Commission’s jurisdiction to remedy unfair international trade practices is limited to “unfair acts” involving the *1290 importation of “articles.” 19 U.S.C. § 1337(a). Thus, when there is no importation of “articles” there can be no unfair act, and there is nothing for the Commission to remedy. Here, the only purported “article” found to have been imported was digital data that was transferred electronically, i.e., not digital data on a physical medium such as a compact disk or thumb drive. The Commission’s April 3, 2014, majority opinion devotes twenty-one pages of analysis to the question of whether “articles” encompasses digital data and ultimately concludes that it does.
We have exclusive jurisdiction over “final determinations of the United States International Trade Commission relating to unfair practices in import trade made under Section 337 of the Tariff Act of 1930.” 28 U.S.C. § 1295(a)(6) (1994). However, when dealing with the interpretation of Section 337, “the ITC is entitled to appropriate deference.” Enercon GmbH v. Int’l Trade Comm’n, 151 F.3d 1376, 1381 (Fed.Cir.1998). As we recently held in Suprema, “[t]here is no dispute that Congress has delegated authority to the Commission to resolve ambiguity in Section 337 if the Commission does so through formal adjudicative procedures.” Suprema, Inc., 796 F.3d at 1345. Furthermore, because the “Commission’s investigations under Section 337 require adequate notice, cross-examination, presentation of evidence, objection, motion, argument, and all other rights essential to a fair hearing,” “we review the Commission’s interpretation pursuant to Chevron ____” Id. (citations omitted) (internal quotation marks, omitted).
Under Chevron, in reviewing an agency’s construction of its organic statute, we address two questions. City of Arlington, Tex. v. FCC, — U.S. -, 133 S.Ct. 1863, 1868, — L.Ed.2d - (2013). The two questions are as follows:
The first is whether Congress has directly spoken to the precise question at issue. If the answer is yes, then the inquiry ends, and we must give effect to Congress’ unambiguous intent. If the answer is no, the second question is whether the agency’s answer to the precise question at issue is based on a permissible construction of the statute. The agency’s interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.
Suprema, Inc., 796 F.3d at 1346 (citations omitted) (internal quotation marks omitted) (brackets omitted).
A. Chevron Step One
“In construing a statute, we begin with its literal text, giving it its plain meaning.” Hawkins v. United States, 469 F.3d 993, 1000 (Fed.Cir.2006).
If the statutory language is plain, we must enforce it according to its terms. But oftentimes the meaning — or ambi-, guity — of certain words or phrases may only become evident when placed in context. So when deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme.
King, 135 S.Ct. at 2489 (citations omitted) (internal quotation marks omitted).
Here we conclude that the literal text by itself, when viewed in context and with an eye towards the statutory scheme, is clear and thus answers the question at hand. “Articles” is defined as “material things,” and thus does not extend to electronic transmission of digital data.
1
The term “articles” is hot defined in the Act. “In the absence of such a *1291 definition, we construe a statutory term in accordance with its ordinary or natural meaning.” FDIC v. Meyer, 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) (citing Smith v. United States, 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993)). When looking to the term’s plain meaning we must look first not to the 1930 Tariff Act but instead its predecessor, the 1922 Tariff Act. That is because the term “articles,” as used in Section 337 of the Tariff Act, originates in section 316 of the Tariff Act. Section 316(a) reads in part:
That unfair methods of competition and unfair acts in the importation of articles into the United States, or in their sale by the owner, importer, consignee, or agent of either, the effect or tendency of which is to destroy or substantially injure an industry, efficiently and economically operated, in the United States, or to prevent the establishment of such an industry, or to restrain or monopolize trade and commerce in the United States, are hereby declared unlawful, and when found by the President to exist shall be dealt with, in addition to any other provisions of law, as hereinafter provided.
Tariff Act of 1922, Ch. 356 § 316 (1922) (emphasis added).
The Commission found that contemporaneous definitions of “articles” “embrace a generic meaning that is synonymous with a particular item or thing, such as a unit of merchandise.” Final Comm’n Op. at 39. In doing so, the Commission relies on the 1924 edition of Webster’s that defines “article,” .in pertinent part, as “something considered by itself and as apart from other things of the same kind or from the whole of which it forms a part; also, a thing of a particular class or kind; as an article of merchandise; salt is a necessary article.” Id. (citing Article, Webster’s New International Dictionary of the English Language (1924)). Based on this definition, the Commission concluded that “the term ‘article’ was understood at the time of the enactment of the Tariff Act to carry the meaning of an identifiable unit, item or thing, with examples indicating that such articles may be traded in commerce or used by consumers” and thus would include digital data. Id. We disagree.
Contemporaneous dictionaries indicate that the term “articles” is limited to a “material thing,” and thus could not include digital data.[12] One such dictionary is cited in a footnote of the Commission’s Opinion, Funk & Wagnalls New Standard Dictionary of the English Language published in 1931. Id. at n. 20. This dictionary defines “article” in relevant part as “a particular object or substance; a material thing or class of things.... ” Article, Funk & Wagnalls New Standard Dictionary of the English Language (1931) (emphasis added). Other contemporaneous dictionaries provide similar definitions, notably The Century Dictionary and Cyclopedia from 1911. This dictionary defines “article” as “[a] material thing as part of a class, or, absolutely, a particular substance or commodity....” Article, The Century Dictionary and Cyclopedia (1911) (emphasis added).[13] Additionally, Webster’s New Modern English Dictionary, published in 1922, defines an “article” as “a material thing, as one of a class.” Article, Web *1292 ster’s New Modern English Dictionary (1922) (emphasis added). As the contemporaneous dictionaries demonstrate, the meaning of the term “article” at the time of the passage of the 1922 Tariff Act was a “material thing” and thus would not include digital data.
The contemporaneous dictionary definition upon which the Commission relied, the 1924 edition of Webster’s, does not aid our search for the definition of “articles” because it is imprecise at best. It is notable, however, that both examples provided in Webster’s dictionary are of material things, indicating that the vague language used was in reference to tangible items.
More modern dictionaries also support the conclusion that an “article” is a tangible thing, including the three that are referenced by the Commission in footnotes 20 and 21 of its final opinion. The Commission refers to Webster’s Third New International Dictionary which defines “article” as “one of a class of material things ... piece of goods; COMMODITY.” Article, Webster’s Third New International Dictionary (1966) (italicized emphasis added). The Commission additionally refers to the 2002 edition of Webster’s Third New International Dictionary which defines “article” as “a material thing .... ” Article, Webster’s Third New International Dictionary - (2002) (emphasis added). Finally, the Commission refers to Random House Webster’s Unabridged Dictionary as published in 2001, which defines “article” as “an individual object, member or portion of a class; an item or particular: an article of food; articles of clothing. ... an item for sale; commodity.” Article, Random House Webster’s Unabridged Dictionary (2001) (emphases added). The Random House dictionary’s use of the term “individual object” further supports “article” being defined as a “material thing.”
Defining “articles” as “material things” is further consistent with the United States Tariff Commission’s[14] own definition of the term “articles” as laid out in its Dictionary of Tariff Information, issued September 1924, While this dictionary is not a “regular dictionary” — because it was published by the Commissioners — nor perfectly contemporaneous — as it was published in 1924 — it does provide us with guidance as to how a person in the respective field would have interpreted “articles” close to the time of the passage of the Tariff Act. The dictionary of Tariff Information defines “articles” as follows:
The word “article” as ordinarily used in tariff acts embraces commodities generally, whether manufactured wholly or in part or not at all. (Jungle [Junge] v. Heddon [Hedden], 146 U.S., 238, 239 [13 S.Ct. 88, 36 L.Ed. 953 (1892) ].) It is used in this sense in section 1 of Title' I of the tariff act of 1922, subjecting to duty “all articles when imported from any foreign country into the United States or into any of its possessions (except the Philippine Islands, the Virgin Islands, and the islands of Guam and Tutuila),” and in section 201 of Title II of that act, exempting from duty “the articles mentioned in the following paragraphs, when imported in the United States or into any of its possessions (except the Philippine Islands, the Virgin Islands, and the islands of Guam, and Tutuila).”
This broad use of the word is also shown in paragraph 1514 of the act of 1922, exempting from duty under stated con *1293 ditions “articles of growth, produce, or manufacture of the United States.”
As defined in section 318 of Title III of the act of 1922, which enlarges the duties of the Tariff Commission, the word “article” includes any commodities grown, produced, fabricated, manipulated, or manufactured.
There are however, tariff provisions in which the word “article” is used in a restricted sense, such as those distinguishing articles from materials. Thus, in paragraphs 920 of the act of 1922, the words “articles” and “fabrics” are applied, respectively, to finished manufactures and to partial manufactures, and in paragraph 1015 provision is made for “fabrics” with fast edges: and also for “articles made therefrom.”
The restricted use of the word “article” has been recognized by the courts and the rule laid down that where an intention appears from the text of the law to give the word “article” a narrower meaning than its ordinarily has, such meaning shall be applied in the administration of the law.
The word “article,” as commonly accepted in trade and elsewhere, has been declared to be something different from bulky and heavy commodities. (Harrison Supply Co. v. United States, 171 Fed. 406, 407 [ (1909) ].)
Vessels arriving at ports of the United States in the ordinary course of navigation are not imported articles. (The Conqueror, 166 U.S. 110, 115 [17 S.Ct. 510, 41 L.Ed. 937 (1897) ].)
Articles, Dictionary of Tariff Information (1924) (emphasis added). The aforementioned definition provides both the “ordinary” use of the term “articles” and the possible scope of the term “articles,” i.e., its broadest and narrowest definition. At its broadest, which the dictionary deems its ordinary meaning, “articles” “embraces commodities generally, whether manufactured wholly or in part or not at all.” The plain understanding of this phrase is that it covers material items that are fully manufactured, material items that are altered in some way, or raw materials. This understanding of the term is further established by the dictionary’s definition of the narrowest use of the term “articles.” The dictionary indicates that narrower definitions of “articles” “distinguish articles from materials.” Consequently, if the narrowest definition is defined as a subset of “materials,” there is an implication that the broadest understanding of the term is confined to “materials.”
Finally, while the contemporaneous second edition of Black’s Law Dictionary does not shed light on the definition of “article,” the third edition does. The third edition of the dictionary, published in 1933, defines “article” in relevant part as “A particular object or substance, a material thing or a class of things.” Article, Black’s Law Dictionary (3d ed.1933) (emphasis added). Again, this definition provides further support that the term “articles” is defined as a “material thing” and thus excludes purely digital data.
The aforementioned dictionaries make clear that the ordinary meaning of the term “articles” is “material things.” It is not a question of whether there are multiple definitions for us to choose between. Instead, every dictionary referenced by the Commission, with the exclusion of one imprecise definition, along with all the other relevant dictionaries point to the fact that “articles” means “material things.” As we “must presume that [the] legislature says in a statute what it means and means in a statute what it says,” Conn. Nat’l Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992), we conclude that “articles” does *1294 not cover electronically transmitted digital data.[15]
2
As the presence of ambiguity in the meaning of a term “may only become evident when placed in context” with the statute, we turn next to how “articles” is used' throughout Section 337. King, 135 S.Ct. at 2489. The use of the word “articles” in other sections of the 1930 Tariff Act reinforces the conclusion that Congress’s unambiguously expressed intent was for “articles” to mean “material things.”
The Supreme Court has consistently held that “identical words used in different parts of the same act are intended to have the same meaning.” Sullivan v. Stroop, 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990) (quoting Sorenson v. Sec’y of Treasury, 475 U.S. 851, 860, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986)); Helvering v. Stockholms Enskilda Bank, 293 U.S. 84, 87, 55 S.Ct. 50, 79 L.Ed. 211 (1934); Atl. Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932). For “[i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.” TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (internal quotation marks omitted). The statutory context in which Congress uses “articles” makes clear that Congress’s unambiguously expressed intent was for “articles” to mean “material things,” not intangibles, for if “articles” had a broader definition, numerous subsections would be rendered inoperative.
The Commission concluded that because the term “articles” appears in the statutory provisions defining a violation of Section 337, 19 U.S.C. §§ 1337(a)(1)(A), (B), (C), and (E), with the terms “importation” and “sale,” the term “articles” is meant to encompass all “imported items that are bought and sold in commerce.” Final Comm’n Op. at 40. The Commission then stated that, in accordance with various Supreme Court and circuit court cases, “articles of commerce” includes digital files. We disagree.[16] The context in which “articles” is used throughout the chapter, not *1295 just this singular subsection, indicates that “articles” means “material things.”
If the term “articles” was defined to include intangibles, numerous statutory sections would be superfluous at best. One such example is the forfeiture subsection of Section 387. This section reads in part:
(i) Forfeiture
(1) In addition to taking action under subsection
(d) of this section, the Commission may issue an order providing that any article imported in violation of the provisions of this section be seized and forfeited to the United States if—
(A) the owner, importer, or consignee of the article previously attempted to import the article into the United States;
(B) the article was previously denied entry into the United States by reason of an order issued under subsection (d) of this section; and....
19 U.S.C. § 1337(i) (emphasis added). This section permits the Commission to exclude “articles” from importation into the United States; however, it is difficult to see how one could physically stop electronic transmissions at the borders under the current statutory scheme. Furthermore, if articles included digital data, it would render the section’s use of the terms “forfeited” and “seized” hollow, as an electronic transmission cannot be “seized” or “forfeited.” By way of example, digital transmissions from satellites do not move through border crossings, nor can they be stopped at our borders via any enforcement mechanism contemplated in the statutory scheme. As Commissioner David S. Johanson points out in his dissent, an “exclusion order directed against electronic transmissions could not only have no effect within the context of Section 337 — it simply would make no sense as it would not be enforce[able].” Final Comm’n Op. Dissent at 6 (David S. Johanson, dissenting).
. A construction of the term “articles” that includes electronically transmitted digital data is also not reasonable when applied to Section 337(i)(3). This section reads, “[u]pon the attempted entry of articles subject to an order issued under this subsection, the Secretary of the Treasury shall immediately notify all ports of entry of the attempted importation and shall identify the persons notified under paragraph (1)(C).” Not only can an electronic transmission not be subject to an “attempted entry” through a “port of entry,” it also cannot be intercepted at a “port of entry” as contemplated'in the statute. Returning to our satellite example, once the transmission is made from a satellite and directed to the United States, it is illogical to consider its entry as an “attempted entry.” The transmission either passes through our border or it does not. If the term “articles” was intended by Congress to be inclusive of nonmaterial objects, such as, electronic transmissions, it would render this section moot.
Align further argues that because “articles” is used in connection with “articles that infringe,” “articles” must be read broadly enough that it encompasses all possible forms of infringement. We disagree. The question before us is not what types of infringement are covered, but what goods are protected from infringement under Section 337. It is perfectly reasonable that Congress only intended that some subset of infringing goods be covered by Section 337. “Further, were we to adopt [the Commission’s] construction of the statute, we would render the word ‘[articles]’ insignificant, if not wholly superfluous. It is our duty to give effect, if possible, to every clause and word of a statute.” Duncan v. Walker, 533 U.S. 167, *1296 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (citation omitted).
3
We further look to the Tariff Act in its entirety as “the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.” King, 135 S.Ct. at 2492. As when defining words in a statute, their ultimate meaning should remain consistent with the remainder of the statute as a term’s meaning must be “compatible with the rest of the law.” Util. Air Regulatory Grp. v. EPA, — U.S. -, 134 S.Ct. 2427, 2442, 189 L.Ed.2d 372 (2014). Here, the basic statutory scheme, and specifically its original remedial scheme, provides further support for the conclusion that Congress understood “articles” to mean “material things” and not to include intangibles such as digital data.
The original version of Section 337 provided only a single remedy for violations:
Whenever the existence of any such unfair method or act shall be established to the satisfaction of the President he shall direct that the articles concerned in such unfair methods or acts, imported by any person violating the provisions of this Act, shall be excluded from entry into the United States, and upon information of such action by the President, the Secretary of the Treasury shall, through the proper officers, refuse such entry.
Tariff Act of 1930, Pub.L. 71-361, 46 Stat. 704 (1930). This sole remedy of exclusion could only have an impact on material things. Obviously, intangibles, such as electronic transmissions, do not pass through United States ports and cannot be excluded by Customs. Thus, as electronic transmissions of digital data could not be excluded in the fashion contemplated by the Act, an expansion of the term “articles” beyond “material things” would mean that Congress included an entire set of commodities in the statute without providing a method to curtail their importation. The impossibility of this result supports confining “articles” to “material things.”
The Commission points to the 1974 authorization of cease and desist orders as support for its conclusion that “articles” includes digital data. The Commission argues that the addition of this section “strengthened the statute to protect against unfairly traded imports by providing additional remedies for a violation. ...” Final Comm’n Op. at 47. We disagree.
Congress’s 1974 authorization of cease and desist orders supports the conclusion that the statutory scheme is premised upon “articles” being defined as “material things.” Fifty-two years after the creation, of Section 337 Congress added a second remedial tool to the Commission’s arsenal, the cease and desist order. See Trade Act of 1974, Pub.L. 93-618, 88 Stat1978, 2055 (1975). This tool was meant to be used as a lesser and “softer remedy” than exclusion orders rather than the exclusive remedy which would be the case were digital data considered an article. Textron, Inc. v. U.S. Int’l Trade Comm’n, 753 F.2d 1019, 1029 (Fed.Cir.1985) (“[T]he contemplated range of remedies was expanded by the Trade Act of 1974 to include ‘softer’ sanctions such as cease-and-desist orders....”); see S. Rep. 93-1298 at 198 (1974). In fact, in passing the bill, Congress made clear that “[n]o change [was] made in the substance of the jurisdiction conferred under Section 337(a) with respect to unfair methods of competition or unfair acts in the import trade.” S.Rep. No. 931298, 1974 U.S.C.C.A.N. 7186, 7327 (1974). Instead, the purpose of the provision, according to the Senate Report, was to add “needed flexibility” because “the existing statute, which provides no remedy *1297 other than the exclusion of articles from entry, is so extreme or inappropriate in some cases that it is often likely to result in the Commission not finding a violation of this section.” Id. at 7331. Furthermore, while the Commission cites to the repeated updates in the amount of the fine associated with cease and desist orders as support for the fact that this section expanded the scope of “articles,” there is no logical connection between the amount of the fine and whether cease and desist orders expanded the Commission’s jurisdiction.
The text of the cease and desist language further supports the conclusion that “articles” cannot be defined in such a way as to include electronic transmissions. This is because if “articles” was defined to include electronic transmissions, the addition of cease and desist orders would not be a lesser alternative for exclusion orders, but an expansion of the exclusion power. We agree with Commissioner David S. Jo-hanson who argued in his dissent that “[ijndeed, [the cease and desist] provision demonstrates that the definition of articles for Section 337(f) must be the same as the rest of the statute; otherwise the provision for replacement [of cease and desist orders with exclusion orders] would be rendered a nullity and read out of the statute.” Final Comm’n Op. Dissent at 8 (David S. Johan-son, dissenting). The fact that a definition of “articles” that includes intangibles would read out the very purpose behind the inclusion of cease and desist orders yields further evidence that the term article is meant to be limited to tangibles.
Finally, Section 337’s connection to what is now known as the Harmonized Tariff Schedule of the United States (HTSUS) supports a narrower definition of the term “articles” than provided by the Commission. When the Tariff Act of 1930 was first passed it was, at its heart, a tariff provision that imposed duties on specific imports. Section 1 of the title reads:
That on and after the day following the passage of this Act, except as otherwise specially provided for in this Act, there shall be levied, collected, and paid upon all articles when imported from any foreign country into the United States or into any of its possessions ... the rates of duty which are prescribed by the schedules and paragraphs of the dutiable list of this title, namely:
46 Stat. 590 (emphasis added). Congress then provided ninety-five pages of schedules identifying specific dutiable and non-dutiable goods. Every single item in these schedules was a material thing., See 46 Stat. 590-685. Furthermore, Congress assumed that these schedules were not comprehensive and thus included catchall clauses. One such clause can be found in paragraph 1559, which reads in relevant part, “That each and every imported article, not enumerated in this Act, which is similar, either in material, quality, texture, or the use to which it may be applied to any article enumerated in this Act ... shall be subject to the same rate of duty which is levied on the enumerated article.... ” Id. at 672. Similarly, paragraph 1558 states, “That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for....” Id. Both of these catchalls are premised on the notion that articles are tangible and dutiable. This provides further evidence that the statutory scheme was to solely regulate “material things” and thus not electronic transmission of digital data, which is not dutiable.
Tariff Schedules have continued to limit articles to tangibles. The dutiable schedules in the Tariff Act of 1930 were later replaced in 1963 with the Tariff Schedule *1298 of the United States, Pub.L. 87-456. Accompanying this revision was the Tariff Classification Study Submitting Report. In this report, the Commission wrote, “General headnote 5 sets forth certain intangibles which,- under various established customs practices, are not regarded as articles subject to treatment under the tariff schedules.” Id. at 18. This subsection includes items such as electricity, securities, and similar evidences of value. Id. at 12. The Tariff Schedule of the United States was in turn replaced by the Harmonized Tariff Schedule of the United States in 1988, pursuant to the Omnibus Trade and Competitiveness Act. Pub.L. 100-418 § 1206, 102 Stat. 1151, codified at 19 U.S.C. § 3006. While this schedule included a heading for electrical energy, it specifically removed it from the purview of section 484 of the Tariff Act of 1930 and placed its regulation purely in the hands of the Secretary of the Treasury. Section 484 regulates the entry requirements under the Tariff Act. This succession of tariff schedules provides further evidence that the Act’s scheme was not meant to include intangibles.
4
The clarity of the statutory context obviates the need to turn to the legislative history. The Tariff Act’s legislative history further confirms the conclusion that “articles” is limited to “material things,” however, and thus not inclusive of electronic transmissions of digital data. This is supported by two distinct points in the Tariff Act’s legislative history: (1) the period of time when “articles” first appeared in Section 337 of the Tariff Act of 1930, inclusive of section 316 of the 1922 Tariff Act; and (2) the legislative history from 1988 in which for the first time the Tariff Act was expanded to explicitly cover IP infringement.
The Commission argues that, because Congress -treated the terms “goods” and “articles” as synonymous within the legislative history, articles must be read broadly. Final Comm’n Op. at 39. We agree with the Commission in part and disagree in part.. We agree with the Commission that Congress used “goods” and “articles” synonymously at the time of the passage of the Act;[17],[18] however, we disagree that this mandates a definition of “articles” that is broader than “material things.”
At the time of enactment “goods” had a clear definition. The second edition of Black’s Law Dictionary, which was contemporaneous with the passage of the Tariff Act, states.that “goods” “[are] not so wide as ‘chattels,’ for it applies to inanimate objects, and does not include animals or chattels real.” Goods, Black’s Law Dictionary (2d .ed.1910). Black’s dictionary divides “chattels” into two groups “chattels real” and “chattels personal.” Id. at Chattels. “Chattels real” are “interests in land which devolve after the manner of personal estate, as leaseholds” while “chattels personal” are “movables only.” Id. The clear conclusion to draw from this is that *1299 “goods” are also limited to movables, i.e., material things. Thus, both words used by Congress at the time of enactment to describe the bounds of Section 337, “goods” and “articles,” were limited to “material things.”
The Commission argues that the legislative history relating to the Omnibus Trade and Competitiveness Act of 1988 reaffirmed that “articles” was meant to include digital data. The Commission relies on the relevant Senate Report’s statement that the will of Congress was to block any United States sale of a product covered by an IP right, because “[t]he importation of any infringing merchandise derogates from the statutory right, diminishes the value of the intellectual property, and thus indirectly harms the public interest.” Final Comm’n Op. at 48 (quoting S. Rep. 100-71 at 12-29 (1987); H.R. Rep. 100-40 at 156 (1987)). The Commission argues that the use of the word “commerce” indicates that “articles” should be read broadly. We disagree.
While the Omnibus Trade and Competitiveness Act made numerous changes to the Tariff Act, it included no language that increased the scope of “articles.” The Commission’s argument fails to take into account the contemporaneous definition of the term “merchandise.” “Merchandise” was defined at the time as “[a]ll goods which merchants usually buy and sell '..., [b]ut the term is generally not understood as including real estate” and “goods,” while “a term of variable content and meaning,” is ultimately defined as “[i]tems of merchandise, supplies, raw materials, or finished goods. Merchandise, Goods, Black’s Law Dictionary (5th ed.1979). Sometimes the meaning of ‘goods’ is extended to include all tangible items, as in the phrase ‘goods and services.’” Id. at Goods. This definition makes clear, that at its broadest the definition of “goods,” and thus merchandise, was limited to tangible items.
This analysis comports with our opinion in Bayer. In Bayer we analyzed the history of section 271(g) along with its overlap with Section 337. We found that Congress adopted the definition of “article” from Section 337 and imported it into section 271(g). Bayer AG v. Housey Pharm., Inc., 340 F.3d 1367, 1374 (Fed.Cir.2003). Our opinion concludes that “there is no indication of any intent to reach products other than tangible products produced by manufacturing processes.” Id. at 1375. Furthermore we stated:
We recognize that section 1337 covers both articles that were “made” and articles that were “produced, processed, or mined.” While this language in section 1337 perhaps suggests a broader scope for section 1337 than for section 271(g), nothing in section 1337 suggests coverage of information, in addition to articles under section 271(g).
Id. at 1367, n. 9.
In sum, the literal text, the context in which the text is found within Section 337, and the text’s role in the totality of the statutory scheme all indicate that the unambiguously expressed intent of Congress is that “articles” means “material things” and does not extend to electronically transmitted digital data.[19],[20]
B. Chevron Step Two
As Congress’s expressed intent is unambiguous, we need not address step *1300 two of Chevron. However, even if we were to address step two, it is clear that the Commission’s interpretation of the term “articles” was unreasonable.
Step two of Chevron requires us to determine “whether the [Commission’s] answer is based on a permissible construction of the statute.” Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Because the Commission failed to properly analyze the plain meaning of “articles,” failed to properly analyze the statute’s legislative history, and improperly relied on Congressional debates, the Commission’s analysis does not warrant deference.
The Commission’s analysis of dictionary definitions evidences the irrationality of the Commission’s interpretation of the term “article.” While the' Commission ostensibly analyzes various dictionary definitions, it fails to adopt a definition consistent with any of the definitions it references. For example, as discussed in the prior section, the Commission turns to the 1924 edition of the Webster’s dictionary for the definition of “article,” but rather than adopt that definition it concludes that it will “embrace a broader meaning that describes something that is traded in commerce.” Final Comm’n Op. at 39. In other words, it generates its own definition, unrelated to the definition provided by the dictionary.
Furthermore, the Commission inexplicably cites to several dictionaries in two footnotes that support “articles” being defined as “material things,” but provides no analysis as to why these dictionaries should not be considered.
Footnotes 20 and 21 read:
20 Some definitions of “article,” in addition to stating a broader generic meaning, also set forth a more granular meaning of a material thing. For example, a 1929 edition of Funk and Wag-nail’s defines “articles,” in pertinent part as: “A particular object or substance; a material thing or class of things; as, an article of food.” The Federal Circuit, interpreting 35 U.S.C. § 271(g), noted one definition of “article” in Webster’s Third New Dictionary (a more recent edition of Webster’s). “Article” is there defined as “one of a class of material things ... pieces of goods; COMMODITY.” Thus, while an “article” was understood to include something material, as shown in the text above, the term was also understood to embrace a broader meaning that describes something that is traded in commerce.
21 More recent context relevant definitions of “articles” are in accord. See, e.g. Webster’s Third New International Dictionary (2002) (“5: a material thing”; ... “6a: a thing of a particular class of kind as distinct from a thing of another class of kind”); Random House Webster’s Unabridged Dictionary (2nd Edition 2001) (“2. An individual object, member, or portion of a class; an item or particular; an article of food; articles of clothing; ... 4. An item for sale; commodity”).
Id. (citation omitted).
Despite the definitions quoted in the footnotes running directly counter to the definition adopted by the Commission, the Commission provides virtually no analysis as to why they should not control. It is not reasonable for the Commission to conclude that the dictionary definitions that it cites “embrace a broader meaning that describes something that is traded in commerce,” when the Commission’s definition cannot be found in any dictionary cited by the Commission and the Commission’s conclusion is not logically connected to any of the definitions cited by the Commission.
*1301 Additionally, the Commission fails to properly analyze the legislative history regarding the Tariff Act. This failure is echoed in its briefing to the court. The Commission concludes, based in large part on a Senate Report from 1922, that “The central purpose of Section 337, since the enactment of the original statute in 1922, has been to prevent every type of unfair act or practice in import trade that harms U.S. industries.” Final Comm’n Op. at 44-45. The Commission’s Opinion cites the Senate Report, S. Rep. 67-595, as authority for this conclusion and then quotes it as follows:
The provision relating to unfair methods of competition is broad enough to prevent every type and form of unfair practice and is, therefore, a more adequate protection to American industry than any antidumping statute the country ever had.
However, the actual quote reads as follows:
The provision relating to unfair methods of competition in the importation of goods is broad enough to prevent every type and form of unfair practice and is, therefore, a more adequate protection to American industry than any antidump-ing statute the country ever had.
S. Rep. 67-595, at 3 (1922) (emphasis added). The Commission’s omission of the phrase, “in the importation of goods” is highly misleading; not only was a key portion of the quote omitted, but it was omitted without any indication that there had been a deletion.[21] Furthermore, while we may agree that the quote, as incorrectly stated by the Commission, would indicate a broad authority for the Commission, the phrase “in the importation of goods” clearly limits the Commission’s authority. And as we discussed above, it limits it in such a way as to exclude non-material things. Because the Commission uses this misquote as its main evidence that the purpose of the act was to cover all trade, independent of what form it takes, the Commission’s conclusion regarding the purpose of the Act is unreasonable.
Finally, the Commission wrongly focuses on current debates in Congress as indicative of what “articles” means. The Commission comments as follows:
We note recent developments that show the acceptance of digital goods traded in commerce as falling within international trade. Senators Baucus and Hatch and Congressman Camp have introduced Trade Promotion Authority bills that instruct the Administration to seek increased protection for digital trade in future trade agreements. Moreover, Congress has requested that the Commission study the impact of digital' trade under Section 332, another part of Title 19.
Final Comm’n Op. at 43, 44 (citation omitted). This analysis is improper. First, Congress has not passed any of the cited bills. Second, even if' the bills were passed, they would not have informed us as to whether the Commission has jurisdiction over digital goods.
In sum, the Commission repeatedly and unreasonably erred in its analysis of the term “article.” It is not simply a question of the Commission having the choice between two “right” definitions, but instead it represents a systematic pattern of the Commission picking the wrong conclusion *1302 from the evidence. Here the Commission has not offered a reasoned explanation for its definition of “articles” and thus is owed no deference.
III. Conclusion
While Congress’s intent regarding “articles” is unambiguous, it is worth repeating what we said in Bayer:
Under these circumstances we think it is best to leave to Congress the task of expanding the statute if we are wrong in our interpretation. Congress is in a far better position to draw the lines that must be drawn if the product of intellectual processes rather than manufacturing processes are to be included within the statute.
Bayer, 340 F.3d at 1376-77.
For the reasons stated above, we reverse and remand the Commission’s decision, finding that the Commission does not have jurisdiction over this case.
REVERSED AND REMANDED.

. While this court recently interpreted the phrase "articles that infringe" in Suprema, Inc. v. International Trade Commission, that opinion does not control here. 796 F.3d at 1344-45. In Suprema, we were dealing with the single issue of whether the respondent violated 19 U.S.C. § 133.7 by inducing a di-' rect patent infringement that did not occur until after a tangible item was imported into the United States. Our opinion turned exclusively on the term "infringe” as used in 19 U.S.C. § 1337(a)(l)(B)(l). Conversely, here we are exclusively looking to the meaning of the term "articles.” Furthermore, the “articles” in question in Suprema were physical objects, and thus do not inform the question now before the court. Indeed the analysis in Suprema supports the decision here, as discussed infra.

. As we do not overcome the threshold issue of the Commission’s jurisdiction, we do not reach the Appellant’s appeal regarding the Commission’s analysis of estoppel, contributory infringement, or invalidity. Appellant's Br. 17-59.

. U.S. Patent No. 6,217,325 ('"325 patent”); U.S. Patent No. 6,705,863 (‘"863 patent”); U.S. Patent No. 6,626,666 (‘"666 patent”); U.S. Patent No. 8,070,487 (‘"487 patent”); U.S. Patent No. 6,471,511 ('"511 patent”); U.S. Patent No. 6,722,880 ('"880 patent”); and U.S. Patent No. 7,134,874 ('"874 patent”).

. Claims 21 and 30 of the '325 patent and claim 1 of the '880 patent.

. Claims 31 and 32 of the '325 patent, claims 1 and 4-8 of the '863 patent, claims 1, 3, 7, and 9 of the '666 patent, and claims 1, 3, and 5 of the '487 patent.

. Claims 7-9 of the '487 patent.

. Claims 1-3, 11, 13-14, 21, 30-35, and 38-39 of the '325 patent, claims 1 and 3 of the '880 patent, claim 1 of the '511 patent, and claims 1-2, 38-39, 41, and 62 of the '874 patent.

. To the extent that Group I and II claims overlap with Group IV claims, the Commission found that these claims were infringed and not invalid. Because of the posture of this appeal, the nature of the overlap is not relevant to this case and thus will not be discussed. •

. Claim 1 of the '880 patent is representative of the Group 1 claims and reads:
A method for making a predetermined series of dental incremental position adjustment appliances, said method comprising:
a) obtaining a digital data set representing an initial tooth arrangement;
b) obtaining a repositioned tooth arrangement based on the initial tooth arrangement;
c) obtaining a series of successive digital data sets representing a series of successive tooth arrangements; and
d) fabricating a predetermined series of dental incremental position adjustment appliances based on the series of successive digital data sets, wherein said appliances comprise polymeric shells having cavities shaped to receive and resiliently reposition teeth, and said appliances correspond to the series of successive tooth arrangements progressing from the initial to the repositioned tooth arrangement.
'880 patent col. 22 11. 13-29.

.Claim 21 of the '325 patent is representative of the Group II claims and reads:
A method for fabricating a dental appliance, said method comprising:
providing a digital data set representing a modified tooth arrangement for a patient; controlling a fabrication machine based on the digital data set to produce a positive model of the modified tooth arrangement; and
producing the dental appliance as a negative of the positive model.
'325 patent col. 17 11. 7-16.

. Commissioner David S. Johanson dissented in the Commission's findings.

. While normally we would turn to the Second Edition of Black’s Law Dictionary, as it was contemporaneous with passage of the 1922 Tariff Act, that dictionary only defines “article” in regard to written documents, not with respect to trade.

. The Supreme Court cited to this dictionary exclusively for the definition of "manufacture” when interpreting the Plant Patent Act of 1930. Am. Fruit Growers v. Brogdex Co., 283 U.S. 1, 11, 51 S.Ct. 328, 75 L.Ed. 801 (1931).

. The United States Tariff Commission is the predecessor of the International Trade Corn-mission.

. We briefly address two arguments raised by the dissent regarding the proper definition of the term "articles” in Section 337. First, the dissent argues that in Lucent Technologies, Inc. v. Gateway, Inc., 580 F.3d 1301, 1321 (Fed.Cir.2009), we "rejected the argument that digital files such as computer software are not a 'material or apparatus' subject to infringement as set forth in the Patent Act at 35 U.S.C. § 271(c).” Dissent at 1307. Lucent involved a patent infringement suit. Thus, Lucent had nothing to do with the scope of the Commission’s jurisdiction. Indeed, it never even considered the term "article,” instead assessing the meaning of the unrelated term "material or apparatus.” Second, the dissent argues that the term " 'article' in the Tariff Act was intended to be all-encompassing.” Id. at 1308 (discussing United States v. Eimer & Amend, 28 C.C.P.A. 10, 1940 WL 4014 (1940)). The "sole question” in Eimer was whether the term "articles” should cover "glass wool” objects, since such objects "do not have definite form and shape.” Eimer, 28 C.C.P.A. at 12. Because the “glass wool” at issue in Eimer was undisputedly a material object, Eimer is inapposite to the present question of whether the term "articles" encompasses intangible data.

. The Commission made this conclusion based upon definitions of "articles of commerce” found in one Supreme Court case and one Seventh Circuit case, Reno v. Condon, 528 U.S. 141, 148, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000), and Senne v. Vill. of Palatine, 695 F.3d 617, 620 (7th Cir.2012). Final Comm’n Op. at 40. These two cases are not relevant to the analysis at hand; they interpret the Driver's Privacy Protection Act rather than the statute at issue in this case.

. "The House and Senate Reports of the 1922 and 1930 Acts and Congressional, debate refer to articles as synonymous with goods.... See S, Rep. 67-595 at 3 (1922); H.R. Rep. 71-7 at 3 (1929); 71 Cong. Rec. S. 3872, 4640 (1929).” Final Comm'n Op. at 43. For example, the Senate Report stated its amendments were meant to "prohibit the importation of particular goods for the purpose of preventing unfair methods of competition in the importation of goods.” S. Rep. 67-595 at 3. The report further noted that, "The provision relating to unfair methods of competition in the importation of goods is broad enough to prevent every type and form of unfair practice.” Id. at 3.

. Our recent opinion in Suprema also uses "goods” synonymously with "articles.” See Suprema, Inc., 796 F.3d at 1340-41.

. This is markedly different from Suprema where we concluded that the relevant text was ambiguous. See Suprema, Inc., 796 F.3d at 1343-46.

. We note that we do not limit the parties’ other legal remedies, such as a possible action in district court.

. It is noteworthy that this is not the Commission’s only failure to cite evidence correctly. The Commission additionally states that "goods, commodities, and merchandise” have the same definition as "articles” as defined in the second edition of Black’s Law Dictionary. Final Comm’n Op. at 43. However, Black’s Law Dictionary does not provide the cited definition.